**In re the Matter of Dennis Darol LINEHAN.**

**Nos. C3–93–381, C8–93–523.**

Court of Appeals of Minnesota.

July 13, 1993.

Review Granted Sept. 10, 1993.

Lisbeth J. Nudell, Minneapolis, Eric S. Janus, St. Paul, for appellant Linehan.

Tom Foley, Ramsey County Atty., Steven C. DeCoster, Richard H. Hoffman, Asst. County Attys., St. Paul, for respondent.

Considered and decided by SCHUMACHER, P.J., and NORTON and PETERSON, JJ.

## OPINION

SCHUMACHER, Judge.

A petition was filed to commit appellant Dennis Darol Linehan as a psychopathic personality, and a hearing was held. The trial court committed Linehan to the Minnesota Security Hospital as a psychopathic personality. The security hospital filed its report, and a hearing was held on Linehan's indeterminate commitment. The trial court committed Linehan to the security hospital for an indeterminate period as a psychopathic personality. Linehan appeals from the initial commitment and from the commitment for an indeterminate period. This court granted Linehan's motion to consolidate the appeals. We affirm.

## FACTS

On October 1, 1965, Linehan pleaded guilty to a charge of kidnapping B.I. and was sentenced to 40 years. Linehan was scheduled to be released on parole on May 15, 1992. On March 25, 1992, the Ramsey County Attorney's office filed a petition for his commitment as a psychopathic personality.

At the commitment hearing, Linehan's victims testified as to assaults which he committed. L.H. testified that on July 18, 1963, she planned to drive to a party with Linehan, whom she met that day, and two of his friends. Instead, after they drove the car to a field, Linehan and one of his companions hit and repeatedly raped her. Linehan testified he did not recall whether L.H. consented, but also testified he violated her and she was innocent.

On June 10, 1965, Linehan went to a residence in Shoreview to window peep, which he had done before. He saw 14-year-old B.I., who was babysitting. He rang the doorbell and, at some point, strangled her. Over the years, Linehan has given various versions of what occurred, both exculpatory and inculpatory.

Linehan first left the body in a wooded area. He then went home and told his wife he thought he had killed someone but could not remember the details. They moved the body to two different locations in the next several weeks. Linehan was arrested for the crime in the latter part of July 1965.

Prior to his arrest, Linehan sexually assaulted several more individuals. In July 1965, during a party, Linehan grabbed 22–year–old W.L., who had been looking for a bathroom, forced her into a bedroom and had sexual intercourse with her against her will. At the hearing, Linehan provided a different version of the incident. He testified W.L. and three or four men were having sex in the bedroom. When the other men left, he went into the bedroom and had sex with her also.

Another incident occurred on July 15, 1965, when Linehan sexually assaulted 12–year–old M.J. M.J. testified that she and her 11–year–old sister were asleep in bed at their home. They were suddenly awakened because Linehan, a friend of their brother, got into bed with them. M.J. testified Linehan threatened to stab them if they screamed. He attempted to or did lick her genital area. Her sister ran upstairs to her mother's room, and Linehan chased her. Linehan testified at the hearing that he had denied the M.J. incident for 15 years, although he now acknowledges it.

On August 6, 1965, a grand jury indicted Linehan for murder in the first degree, murder in the second degree, and kidnapping. On October 1, 1965, Linehan pleaded guilty to a charge of kidnapping, and the murder charges were dismissed. The trial court sentenced him to 40 years. Linehan's guilty plea was reviewed twice by the Minnesota Supreme Court and eventually affirmed. *State v. Linehan*, 282 Minn. 254, 164 N.W.2d 616 (1969); *State v. Linehan*, 276 Minn. 349, 150 N.W.2d 203 (1967). The federal court of appeals affirmed the federal district court's dismissal of his petition for a writ of habeas corpus. *Linehan v. State of Minnesota*, 437 F.2d 395 (8th Cir.1971).

Between 1965 and 1975, when Linehan was in prison, he engaged in an elaborate, extensive letter writing campaign in an attempt to obtain his release. Numerous individuals and organizations wrote letters on his behalf, and a physician who examined him wrote a report favorable to his release.

In August 1974, parole was denied. Linehan challenged this decision. The Minnesota Supreme Court later affirmed the district court's denial of a petition for a writ of habeas corpus. *State v. Linehan*, 311 N.W.2d 507 (Minn.1981) (unnecessary to decide merits because subsequent escape and commission of crime provided parole authority with new, independent grounds for denying release). In December 1974, Linehan was transferred to the minimum security portion of the prison. On June 20, 1975, Linehan escaped. Eleven days later, he was arrested in Michigan for assault with intent to commit criminal sexual conduct on 12–year–old T.L.

T.L. testified that in this incident, she and two friends were hitchhiking and Linehan picked them up. After T.L. left her friends at the beach, Linehan pursued her, and when she sought assistance from other people, he claimed he was her father.

Later, while T.L. was walking along the road, Linehan came out of the woods and pushed her down an embankment and into a ditch. She screamed and resisted. He jumped on top of her, told her not to scream or he would kill her, and said that he wanted to have oral sex and intercourse with her. Again, Linehan testified to a different version from that of the victim. Linehan testified T.L. had unzipped her shorts and that he had no knife. T.L. testified he tried to disrobe her, and that he had a knife. The trial court credited her testimony. The assault was interrupted when people arrived on the scene, alerted by the commotion.

Linehan, who was convicted of attempted rape, threatened to kill T.L. when he got out. Linehan served time in prison in Michigan for this offense from July 1, 1975 to September 26, 1980. He was then returned to Minnesota.

Linehan attended several treatment programs, including the Lino Lakes Transition-

al Sexual Offender Program (TSOP), which he entered on July 18, 1991. He also attended another treatment program of an unspecified type while in Michigan.

The trial court heard extensive testimony from four experts. The trial court credited the testimony of Dr. Hector Zeller, a psychiatrist who was the court's first appointed examiner, and Dr. Richard Friberg, a licensed consulting psychologist. Both of these experts testified Linehan met the standards for commitment as a psychopathic personality. They did not believe Linehan had changed during his incarceration and TSOP treatment. Dr. Nancy Steele, a psychologist who is the head of the TSOP in which Linehan was enrolled, and Dr. John Austin, a licensed consulting psychologist who examined Linehan, believed that Linehan did not presently meet the standards for commitment as a psychopathic personality. They both believed that he had benefited from the TSOP such that he could be treated in the community. The trial court explicitly rejected these conclusions by Drs. Steele and Austin.

The trial court determined Linehan was a psychopathic personality and committed him to the Minnesota Security Hospital for a 60–day evaluation. In an attached memorandum, the court stated:

The Court is convinced that Dennis Linehan is manipulating, deceiving, and lying when it suits his purpose. He cannot be relied upon to do what he says he will do. He has minimized his involvement in the crimes he has committed. He has failed to disclose to Dr. Steele and the treating team at the TSOP program many of his sexual assaults and he has minimized his involvement even to the extent that he has convinced Dr. Nancy Steele that the [B.I.]'s death was "accidental." He continues to act in a manipulative and deceitful way, even while in prison, as demonstrated with his "business" while in prison in North Dakota. He is capable of being extremely convincing. Prior to 1975, he convinced many persons that he was ready to be released into the community and that he would not reoffend. Within 11 days of his escape, he was back in jail.

The court recognized that some of the treatment was successful. The court, however, believed Linehan had not even completed the first step of admitting his past behavior and its effect on the victims. The court found Linehan had not learned the precursors to his sexual acting out and has no concept of what he needs to do to prevent reoffending. While he has said he is sorry, the court noted he only recently acknowledged the crimes against M.J., W.L., and L.H. were actually wrong. The court found he minimized the incident with T.L. to the extent that he actually believed she somehow enticed him to sexually assault her by taking off her own clothing.

After the security hospital submitted its report, a 60–day hearing was held. Dr. Zeller reaffirmed the opinions and recommendations he made at the earlier hearing, as did Dr. Austin.

Dr. Darrel John Hulsing from the security hospital testified Linehan cooperated in treatment, did his assignments, and engaged in appropriate conduct. Dr. Hulsing described Linehan as possessing a high chance of repeating his sexually aggressive behavior unless he is treated successfully and released into the community only under control and supervision. He believed Linehan had potential to benefit substantially from treatment, because of his intelligence, his ability to interact, his insight, his physical health, and the fact that he completed the TSOP.

The trial court expressed concern with items from the record at the security hospital, which it concluded showed Linehan's continued attempts to manipulate the system. Also, on January 10, 1993, Linehan was observed testing locked doors and reading a map of St. Paul Ramsey Medical Center. This caused concern to authorities in view of his history of escapes from secured areas, because Linehan was being transported to the St. Paul Ramsey Medical Center courtroom for the mental status exam and the 60–day hearing. On February 2, 1993, Linehan described a fantasy he had of disrobing a nurse with his eyes while he was at the St. Paul Ramsey Medi-

cal Center and also described a rape fantasy. Dr. Hulsing described his interpretation of this rape fantasy as positive and a sign that Linehan was progressing in treatment because he was able to relate it to others.

The trial court found that Linehan met the standards set forth in Minn.Stat. § 526.09. The court found he has a mental disorder diagnosed as an anti-social personality disorder and paraphilia. He has had a habitual course of sexual misconduct from age 11 to 19, and his conduct shows an utter lack of power and ability to control his sexual impulses. His condition is only partially treated, and he continues to be dangerous to others. The trial court committed him for an indeterminate period to the Minnesota Security Hospital as a psychopathic personality.

Linehan appeals from the commitment as a psychopathic personality and from the commitment as a psychopathic personality for an indeterminate period.

### ISSUES

1. Did the trial court properly find clear and convincing evidence that Linehan was a psychopathic personality?

2. Is Minn.Stat. § 526.09 (1992) unconstitutional as a violation of due process?

### ANALYSIS

1. The term psychopathic personality is defined as

the existence in any person of such conditions of emotional instability, or impulsiveness of behavior, or lack of customary standards of good judgment, or failure to appreciate the consequences of personal acts, or a combination of any such conditions, as to render such person irresponsible for personal conduct with regard to sexual matters and thereby dangerous to other persons.

Minn.Stat. § 526.09 (1992). The Minnesota Supreme Court has narrowed the definition of psychopathic personality to include

persons who by an habitual course of misconduct in sexual matters have evidenced an utter lack of power to control

their sexual impulses and who as a result are likely to attack or otherwise inflict injury, loss, pain, or other evil on the objects of their uncontrolled and uncontrollable desire. It would not be reasonable to apply the provisions of the statute to every person guilty of sexual misconduct nor even to persons having strong sexual propensities. Such a definition would not only make the act impracticable of enforcement and perhaps unconstitutional in its application, but would also be an unwarranted departure from the accepted meaning of the words defined.

*State ex rel. Pearson v. Probate Court of Ramsey County*, 205 Minn. 545, 555, 287 N.W. 297, 302–03 (1939), *aff'd*, 309 U.S. 270, 60 S.Ct. 523, 84 L.Ed. 744 (1940).

The provisions of chapter 253B regarding commitment of persons mentally ill and dangerous apply to persons alleged to have a psychopathic personality. Minn. Stat. § 526.10, subd. 1 (1992). Proof must be by clear and convincing evidence. Minn. Stat. § 253B.18, subd. 1 (1992).

Linehan does not challenge the trial court's determination that the factors set out in Minn.Stat. § 526.09 were satisfied. Instead, he contends that the narrowed definition in *Pearson* was not met.

Linehan does not seriously contest that his past behavior was that of a psychopathic personality. Linehan's own expert, Dr. Austin, stated in his report there was little doubt in his mind that Linehan would have met the statutory criteria for commitment in 1965. He described Linehan's records as showing someone "essentially out of control" at that time. Linehan's earlier behavior was comparable to the behavior of others committed as a psychopathic personality. *Cf. In re Martenies*, 350 N.W.2d 470, 471 (Minn.App.1984) (long history of sexual, sadistic, aggressive behavior, including abuse of 7–year–old stepdaughter, 9–year–old niece, and wife, as well as rape of unrelated 13–year–old girl), *pet. for rev. denied* (Minn. Sept. 12, 1984). Linehan's argument focuses on the theory that there was an insufficient showing he is likely to

engage in dangerous sexual conduct in the future.

Linehan uses the statutory definition of mentally ill and dangerous, as well as the *Pearson* definition, in his argument. *See* Minn.Stat. § 253B.02, subd. 17. The rights and procedures for one committed as mentally ill and dangerous apply to one alleged to be or committed as a psychopathic personality. Minn.Stat. § 526.10, subd. 1. This does not mean the definition of mentally ill and dangerous should be used for one committed as a psychopathic personality. Instead, Minn.Stat. § 526.09 and *Pearson* provide the relevant definitions.

Linehan argues that the long period of time he was imprisoned before the petition was brought, and the fact that the instances of sexual misconduct occurred in the mid 1960s and 1975, make prediction of future dangerousness more difficult. It is not unusual, however, to use incidents which occurred many years previously. *See In re Monson*, 478 N.W.2d 785, 787 (Minn.App. 1991) (testimony as to abuse which occurred in 1979 and 1985, as well as more recent instances).

■ Linehan also cites his lack of sexual misconduct while imprisoned. Good behavior in the artificial atmosphere of a prison or hospital is not determinative where the medical experts testify the person would act out in a sexually aggressive or harmful manner with less supervision. *See State v. Ward*, 369 N.W.2d 293, 296–97 (Minn.1985); *In re Hofmaster*, 434 N.W.2d 279, 281 (Minn.App.1989).

At the hearing, the experts addressed whether Linehan met the standard for commitment as a psychopathic personality. Drs. Steele and Austin believed that, while Linehan should receive further treatment in the community, he benefited from the treatment he received and has not shown recent evidence of behavior meeting the standards for commitment. Drs. Friberg and Zeller, whose testimony the trial court explicitly credited, concluded Linehan had not changed in substantial respects and that he remained a psychopathic personality.

The trial court made extensive findings as to the experts' testimony and specific reasons for rejecting or crediting it. The court's exhaustive review will not be summarized here. The court cited Dr. Zeller's testimony, however, that Linehan "conned everybody" prior to 1975, when he sought to be released on parole. Dr. Zeller equated Linehan's present position to the situation in 1975, in which several experts and many acquaintances recommended his release. At that time, he escaped and went on to commit another attempted sexual assault.

The trial court also explicitly credited Dr. Friberg's testimony that there was no compelling data Linehan has changed in any substantial respect. Dr. Friberg believed Linehan minimized his involvement in B.I.'s death and the assaults and was able to explain his views quite convincingly, putting himself in a more favorable light. These determinations by the trial court involved an evaluation of the credibility of experts. The trial court's findings are supported by the record and are not clearly erroneous. *See In re Joelson*, 385 N.W.2d 810, 811 (Minn.1986).

Accepting the trial court's determination of credibility of the experts, the issue which remains is whether there was a sufficient showing that Linehan has an utter lack of ability to control his behavior in the future. Linehan contends that the initial order did not discuss the factor and that, in the order on the indeterminate commitment, the trial court only made a reference to it in its conclusions of law without supporting facts. Further, Dr. Zeller, upon cross-examination, could not discuss the standards set forth in *Pearson*. Linehan also cites various experts who discuss the difficulty of predicting future behavior.

The trial court concluded in its order for indeterminate commitment that Linehan's conduct showed an utter lack of power and ability to control his sexual impulses, that his condition is only partially treated, and that he continues to be dangerous to others by sexual attack. The extensive facts, including the testimony of the experts which

the court specifically credited, support this determination.

Despite Linehan's citation to studies showing the difficulty of predicting future behavior, Dr. Friberg and Dr. Zeller predicted that, as to Linehan, future impulsive sexual misconduct was likely based upon his past acts and the fact he has not changed since he committed the assaults in the 1960s and in 1975. Dr. Zeller specifically explained Linehan cannot recognize the precursors to offending, and his behavior has not changed. Dr. Friberg offered similar testimony. Linehan's present behavior in the security hospital caused concern to the trial court.

■ Finally, Dr. Zeller's unfamiliarity with *Pearson* is not determinative. The trial court had extensive testimony to support its findings. A trial court must make a legal determination as to whether a person meets the appropriate standards, with the assistance of expert medical testimony. *See In re Moll,* 347 N.W.2d 67, 70 (Minn. App.1984). Under the facts of this case, the trial court properly determined those standards were met.

■ 2. Linehan also contends that the statute is unconstitutional. This court rejected a constitutional challenge to the psychopathic personality statute. *In re Blodgett,* 490 N.W.2d 638 (Minn.App.1992), *pet. for rev. granted* (Minn. Nov. 3, 1992). We deem that decision controlling at present.

### DECISION

The commitment of Linehan as a psychopathic personality for an indeterminate period is affirmed.

**Affirmed.**