In the Matter of the CIVIL COM-
MITMENT OF Timothy Jo-
seph CROSBY.

No. A12–1224.

Court of Appeals of Minnesota.

Jan. 7, 2013.

352

Brian C. Southwell, Minneapolis, MN, for appellant.

Lori Swanson, Attorney General, St. Paul, MN; and John Choi, Ramsey County Attorney, Beth G. Sullivan, Assistant County Attorney, St. Paul, MN, for respondent.

Considered and decided by ROSS, Presiding Judge; HOOTEN, Judge; and CRIPPEN, Judge.*

* Retired judge of the Minnesota Court of Ap-    peals, serving by appointment pursuant to

## OPINION

ROSS, Judge.

Timothy Crosby's sexual crimes against girls and women include a 1987 rape that resulted in his pleading guilty to third-degree criminal sexual conduct in exchange for the state's promise that it "will not file petitions in probate court" for civil commitment of Crosby as "mentally ill and dangerous" or a "sexual psychopath." But in 2009 the district court committed Crosby indeterminately as a sexually dangerous person and sexual psychopathic personality predicated on a finding that Crosby reengaged in a cycle of sexual misconduct. The district court relied on Crosby's 2009 conviction of using a minor in a sexual performance and on his possession of sexually violent literature and images depicting behavior consistent with his own prior sexually violent behavior. Now appealing from the order for civil commitment, Crosby argues that the district court erred by failing to enforce the state's 1987 promise not to pursue his civil commitment, by misconstruing his 2009 conduct as "harmful sexual conduct," and by finding that he cannot control his sexual impulses and is likely to engage in acts of harmful sexual conduct. Because the 1987 plea agreement prohibited the state from seeking civil commitment solely for his extant offenses but not for future misconduct, the state's 1987 promise does not prevent Crosby's current commitment. And because the district court had a sufficient factual basis to find that Crosby has returned to his violent offense cycle and clear and convincing evidence supports his civil commitment, we affirm.

## FACTS

Timothy Crosby is a violent sexual recidivist. We recount some of his predatory behavior to frame the legal issues he raises on appeal.

By his own account, Crosby began attacking girls and young women in the early 1970s. In about 1972, he picked up a teenage hitchhiker and forced her at gunpoint into the back seat of his car where he made her disrobe. He fondled her breasts and vagina. In the months that followed, Crosby masturbated daily while fantasizing about this assault until his next offense in December 1974.

The December 1974 offense was an escalated version of the 1972 offense. Crosby kidnapped and raped a 20–year–old hitchhiker. He picked her up in St. Paul, handcuffed her at gunpoint, cut her bra off with a knife, and taped her eyes shut. He drove her to his parent's cabin near St. Cloud, and along the way he threatened to kill her. He tied her wrists and legs to bedposts and photographed her. After several hours, Crosby removed her from the bed, handcuffed her again, and drove her to a spot by the Mississippi River in Monticello. There, he stripped her naked and raped her at knifepoint while she remained handcuffed. He then slowly drove her back to St. Paul. During the drive he told the victim about a girl who had recently been raped and murdered and dismembered, stating, "Why should I start caring now, you're no different." Back in St. Paul, Crosby drove in circles. The victim, convinced that Crosby would kill her, lunged and pressed the gas pedal when she saw an occupied police car. This caused a crash, leaving Crosby to flee on foot from the officer and the victim to escape toward the officer.

Criminally convicted and civilly committed to the Intensive Treatment Program for Sexual Aggressives for his 1974 sexual assault, Crosby was eventually released to a halfway house in 1982. He had told his

Minn. Const. art. VI, § 10.

sex-offense treatment providers that he had his sexually aggressive fantasies under control. A year later he moved into his parents' St. Paul home and received only monthly outpatient treatment services. But he had already returned to fantasizing about rape, looking at photographs and magazines depicting sexual violence, and watching films about rape and sexual bondage at a pornographic bookstore. He walked at night carrying a knife, watching women in bars while imagining raping them. He drove around looking for hitchhikers or prostitutes and masturbated while imagining raping them.

Before long, in April 1983, Crosby assembled a kit consisting of a gag, a blindfold, and rope, and then he drove around until he found a girl hitchhiking. He drove her to her requested destination, but then he put a knife to her ribs. He planned to blindfold and bind her hands before driving her to a rural area and raping her. And he imagined hanging her by her hands from the ceiling to facilitate his planned sexual assault. But she resisted, screaming and fighting for the knife. She finally wrested the knife from Crosby, cut him on the hand, and escaped from his car.

Crosby was reported and returned to the Minnesota Security Hospital in 1983 for more treatment. He continued to fantasize about rape and to constitute an "extremely high risk" to reoffend, but he was given passes to shop in St. Peter and the Twin Cities area. In early 1986, he again told treatment providers that he was no longer engaging in sexually violent fantasies, and he was provisionally discharged in June 1987.

The month after his June 1987 release, Crosby brought a 21–year–old prostitute to his apartment. He choked her, tied her to a bed, taped her mouth and eyes shut, and raped her six or seven times over several hours. The victim eventually freed herself from the restraints and escaped after Crosby left her momentarily unattended. She tore through concealing cardboard and then broke through the window, which Crosby had nailed shut. She crawled outside and was found fleeing naked, bleeding from her hands and feet from their having been wired behind her back. Crosby pleaded guilty to third-degree criminal sexual conduct for this. Crosby's plea agreement in that 1987 case is the focal point of this appeal. In it, the state dismissed a count of false imprisonment, agreed not to seek an upward departure at sentencing, and, most important here, agreed not to file a petition seeking Crosby's commitment as a sexual psychopath or as a mentally-ill and dangerous person. The district court sentenced him to 41 months in prison. Crosby declined sex-offender treatment.

The state released Crosby from prison at the conclusion of his sentence in October of 1989 and returned him to the Minnesota Security Hospital where the term of his prior commitment had been extended another five years. Crosby was discharged from that commitment on a writ of habeas corpus because the district court had erred in his original 1975 commitment by basing the commitment on kidnapping, which was not then one of the enumerated offenses authorizing commitment.

After that, Crosby lived free of supervision, and on the surface his life appeared to have somewhat stabilized. He married in 1996 at age 40; his wife was a 19–year–old whom he had begun dating when she was 17. Crosby and his wife had three children. He lived without any new reported improper sexual incident until 2000.

In 2000 Crosby was fired from his custodial job at the University of Minnesota when he printed more than 50 pages of

violent pornographic stories about dominance, torture, rape, incest, and other violent or deviant sex acts. Although Crosby's workplace misconduct violated his employer's policies and revealed his renewed interest in the same violent criminal conduct he had previously engaged in, the misconduct itself was not criminal. Law enforcement officials remained uninvolved with him until 2009.

In July 2009, police executed search warrants to obtain a sample of Crosby's DNA as part of a criminal investigation that has no direct connection to this case; Crosby was excluded as the source of the perpetrator's DNA, but the crime and Crosby's violent past received media attention that prompted one alarmed reader to report that her 17–year–old daughter was spending time with Crosby. Authorities executed a search warrant on Crosby's home to investigate his involvement with the girl. They found several trunks containing a hacksaw blade and an array of newspaper articles about violent sexual assaults, including rapes, kidnappings, murders, and serial killings. They also found hundreds of pornographic videotapes, magazines, and books depicting circumstances and conduct resembling Crosby's past violent sex crimes.

The reader's tip also led to a warrant to seize electronic data related to child pornography. Police recovered a computer hard drive with two password-protected and encrypted files. These files contained hundreds of images depicting a wide array of sexually explicit content, including torture, rape, bondage, abduction, child pornography, bestiality, and death. They also contained numerous articles about abduction, torture, rape, and murder of women and girls. And police found a handbook that contained instructions on how to abduct, torture, and kill a woman for pleasure. Crosby admitted to searching for rape pornography and that he received sexual pleasure from the material.

The investigation revealed that Crosby had again engaged in criminal sexual misconduct. Twice in 2009, Crosby hired a 17–year–old girl to engage in sexual activity with a 24–year–old woman while Crosby watched and masturbated. Crosby would also drive them around a cemetery where he talked about sex, referred to his previously being out of control, and mentioned how lucky they were that he could control himself. For his conduct with the 17–year–old, Crosby pleaded guilty to the use of a minor in a sexual performance. He received the presumptive prison sentence of 24 months, the execution of which was stayed on condition that he obey the sex-offender directives given in his treatment. The state petitioned for Crosby's civil commitment as a sexually dangerous person and as a sexual psychopathic personality under Minnesota Statutes section 253B.02, subdivisions 18b and 18c (2010).

On the state's motion, the district court revoked Crosby's probation for the lack of an appropriate out-patient treatment solution. This court reversed the revocation because neither the probation agent nor the district court had specifically ordered Crosby into sex-offender treatment, making the revocation for failure to participate in treatment a violation of Crosby's due process rights. *State v. Crosby*, A10–1460, 2011 WL 1545652 (Minn.App. Apr. 26, 2011). Crosby was returned to probation again in May 2011, and the district court ordered him detained until it decided the petition for his civil commitment.

Before trial on the petition for Crosby's civil commitment, Crosby unsuccessfully moved the district court to dismiss the petition as prohibited by the 1987 plea agreement in which the state had agreed not to seek Crosby's indeterminate civil commitment. At trial Crosby testified

about his history of sexual violence in a manner that led the district court to deem the testimony incredible, finding that Crosby "made excuse[s] for his behaviors, minimized his conduct and remembered only things that made him look better." Three forensic psychologists testified and provided reports: Dr. Harry Hoberman (retained by the state); Dr. Peter Meyers (appointed by the court); and Dr. Thomas Alberg (chosen by Crosby). The district court found most credible the testimony of Drs. Meyers and Hoberman, both of whom opined that Crosby met the commitment criteria largely because Crosby's 2009 behavior was part of his offense cycle in his course of harmful sexual misconduct.

The district court made extensive and thorough findings. It concluded that Crosby met the standards for indeterminate civil commitment both as a sexual psychopathic personality and as a sexually dangerous person, and it ordered Crosby indeterminately committed. This appeal follows.

## ISSUES

I. Did the district court err by denying Crosby's motion to dismiss despite the 1987 plea agreement in which the state promised not to seek commitment?

II. Was Crosby's sexual misconduct in 2009, leading to his conviction for use of a minor in a sexual performance, part of a habitual course of misconduct or harmful sexual conduct as required for civil commitment?

III. Did the district court err by finding that Crosby "has an utter lack of power to control his sexual impulses" as required for commitment as a sexually psychopathic personality and "is likely to engage in acts of harmful sexual conduct" as required for commitment as a sexually dangerous person?

## ANALYSIS

■ Crosby challenges the district court's decision to civilly commit him as a sexual psychopathic personality and a sexually dangerous person. The district court rested its commitment decision on its conclusion that the state has proved Crosby's need for commitment by clear and convincing evidence. *See* Minn.Stat. § 253B.18, subd. 1(a) (2010). Some of Crosby's challenges raise factual issues and others raise legal issues. Regarding the factual issues, we review the district court's findings of fact for clear error. Minn. R. Civ. P. 52.01; *See also In re Joelson*, 385 N.W.2d 810, 811 (Minn.1986). We give due deference to the district court as the best judge of the credibility of witnesses. *In re Knops*, 536 N.W.2d 616, 620 (Minn.1995). And where, as here, the findings of fact "rest almost entirely on expert testimony, the district court's evaluation of credibility is particularly significant." *Id.* But we review legal issues de novo, including whether the record contains clear and convincing evidence to support the district court's conclusion that Crosby meets the standard for civil commitment. *See In re Thulin*, 660 N.W.2d 140, 144 (Minn.App. 2003).

### I

■ We reject Crosby's first argument that his 1987 plea agreement precluded the district court from acting on the 2009 petition for commitment. Crosby acknowledges that the plea agreement does not prohibit *all* future petitions for commitment, but he insists that it prohibits any future petition unless it is predicated on a finding that he engaged in a new act that qualifies as "harmful sexual conduct" under the sexually dangerous person statute. *See* Minn.Stat. § 253B.02, subd. 7a (2008) (defining harmful sexual conduct as "sexu-

al conduct that creates a substantial likelihood of serious physical or emotional harm to another"). Because he has not engaged in any new act of harmful sexual conduct, he argues, the district court should have dismissed the commitment petition. The argument has two problems.

The first problem with Crosby's argument is that we see no weakness in the district court's conclusion that Crosby's use of a minor in a sexual performance constituted "harmful sexual conduct," a conclusion supported factually by two experts who were found credible by the district court. But it is unnecessary for us to analyze this mostly factual question in detail because it is clear that the argument faces a more fundamental second problem.

The second problem with Crosby's argument is that it obviously has no legal merit. We recognize that if a guilty plea rests "in any significant degree" on a promise by the state, that promise must be fulfilled (or the defendant has a right to withdraw the plea). *State v. Brown,* 606 N.W.2d 670, 674 (Minn.2000). But nothing in Crosby's plea agreement indicates that a future petition for his commitment arising from his future conduct must be premised only on his "harmful sexual conduct." The agreement says,

> The state and the defense have agreed that the defendant will plead guilty as charged to criminal sexual conduct in the third degree.... The state will not file a petition in probate court that the defendant is mentally ill and dangerous or a sexual psychopath.

With no express or implied restricting language, the state's 1987 promise did not prevent the state from seeking civil commitment if Crosby engages later in conduct that triggers a civil-commitment petition. The statutory criterion for civil commitment is that the state must have "good cause" before instituting commitment proceedings. Minn.Stat. § 253B.185, subd. 1(b). We have already held that the district court can consider conduct that did not result in a criminal conviction when making commitment determinations. *In re Civil Commitment of Ramey,* 648 N.W.2d, 260, 268 (Minn.App. 2002), *review denied* (Minn. Sep. 17, 2002). It follows that evidence of sexually related conduct that indicates that an allegedly recovered sexual predator has returned to his cycle of predatory sexual behavior can constitute good cause for a commitment petition under section 253B.185, subdivision 1(b). We turn to whether Crosby's conduct meets the statutory "good cause" prerequisite.

We hold that the district court here had good cause to accept the state's commitment petition. The petition-supporting facts include Crosby's 2009 conduct and conviction for use of a minor in a sexual performance; the 2009 recovery from Crosby's home of the newspaper articles and other written material depicting sexual violence; the hundreds of sexually-oriented explicitly violent depictions in the encrypted files found on Crosby's computer; and Crosby's numerous statements made in treatment after 1987 expressing his continued interest in sexual violence and his difficulty controlling his sexually violent urges. The district court was not presented with these facts in a vacuum; it received them in the context of Crosby's history of already having engaged—repeatedly—in the kind of violent and criminal sexual conduct depicted in the disturbing material that, apparently, once again captivated him. The district court was aware that this same self-tempting, fantasy conduct had accompanied Crosby's previous predatory sexual behavior. These facts do not necessarily prove, as Crosby maintains, "that he can be sexual and concurrently control his actions." At the very

least their description in the commitment petition along with Crosby's past criminal activity alerts the district court that the question of renewed commitment is ripe. Crosby insists that this new conduct is not of the commitment-triggering violent nature of his former conduct because he had not acted on his fantasies. But having placed himself again on the self-tempting slippery edge, Crosby has no statutory reason to demand that the district court must wait for another fall before it entertains the state's civil-commitment petition.

We therefore hold that the district court did not err when it found that the evidence of Crosby's post–1987 conduct, including his recent conduct, constitutes good cause for the state's commitment petition. The district court therefore did not abuse its discretion by refusing to dismiss the petition.

## II

We also find unconvincing Crosby's argument that the district court erred by finding his 2009 conduct with a girl and a woman to be "in the course of harmful sexual conduct" and that it constitutes part of a "habitual course of sexual misconduct" under the commitment statutes. A sexually dangerous person is one who has engaged in a course of harmful sexual conduct, has manifested a sexual personality, or has any other mental disorder or dysfunction, and is likely to engage in acts of harmful sexual conduct. Minn.Stat. § 253B.02, subd. 18c (2010). "Harmful sexual conduct" is "sexual conduct that creates a substantial likelihood of serious physical or emotional harm to another." Minn.Stat. § 253B.02, subd. 7a. Similarly a person with a sexual psychopathic personality is one who engages in a habitual course of misconduct in sexual matters, has an utter lack of power to control sexual impulses, and is dangerous to others.

Minn.Stat. § 253B.02, subd. 18b; *In re Linehan (Linehan I)*, 518 N.W.2d 609, 613 (Minn.1994).

Again, we need not consider whether Crosby's 2009 conduct with the two solicited females by itself constitutes harmful sexual conduct. A sexually oriented civil commitment proceeding is not an isolated snapshot; the repeated statutory focus on a *course* of sexual conduct and the objective in both subdivisions to avoid danger informs us that the proceeding takes a longer, broader view of the person; it examines whether the offender's relevant sexual history and recent sexual conduct exposes a developing story that will, if unaltered, likely culminate in harmful sexual conduct. Crosby's concentration only on his most recent sexual crime is the wrong focus.

In finding that Crosby engaged in a course of harmful sexual conduct and a habitual course of misconduct in sexual matters, the district court found four events presumptively harmful under Minnesota Statutes section 253B.02, subdivision 7(a)(b). These were Crosby's 1972 or 1973 uncharged abduction and sexual assault, his 1974 abduction and sexual assault, his 1983 attempted abduction and sexual assault, and his 1987 imprisonment, strangulation, and sexual assault. The district court also considered Crosby's collection of sexually violent newspaper articles, books, and videos, his accessing of sexually violent pornography in 2000, and the similar sexually violent material found on his computer in 2009. And finally, the court considered his 2009 illegal sexually voyeuristic conduct in paying the girl to have sex with the woman.

It cannot be disputed that, dating back to the 1970s, Crosby "has engaged in a course of harmful sexual conduct." That "course," or pattern, or cycle in Crosby's case, has intermittently been retriggered

by his fantasy of violent sexual predation and has episodically culminated in his perpetrating abductions, sexual bondage, and rapes. Crosby's admitted return to his sexual-assault ideation—as acknowledged in his 2009 statements to investigators and as proven by his accumulation of graphic, sexually violent literature and images—is sufficient support for the finding that he has returned to the same course of harmful sexual conduct that has left multiple sexually assaulted women fleeing for their lives. The district court found that Crosby's conduct demonstrated a pattern of escalation that started with his viewing of violent images and frequenting strip clubs and that moved up to paying a minor and a young vulnerable woman to perform sexually in a locked motel room while Crosby masturbated. The logical relationship between Crosby's historic violent sexual behavior and the recently discovered images and articles depicting torture, rape, bondage, abduction, child pornography, bestiality, and the murder of women and girls is so obvious that we have no difficulty affirming the district court's implicit connection between Crosby's former pattern of misconduct and his recent pattern of misconduct.

In addition to the conduct evidence, the district court was presented with consistent professional testimony opining that Crosby "has failed to avoid precursors that trigger impulsive behaviors" and that he has only a "superficial representation of being in control" while he maintains an "underlying fantasy of abduction, torture, bondage, and rape." Informed by multiple expert opinions, supported by ample evidence of historic and recent behavior, and structured in what we hold is the proper legal framework, the district court recognized that "[t]he danger signs are present and the court is not required to delay commitment until someone experiences greater harm." It reasonably connected

past and present patterns of conduct and concluded that Crosby's recent conduct proves that presently he "is dangerous to other persons" under subdivision 18b and that in the future he "is likely to engage in acts of harmful sexual conduct" under subdivision 18c. For these reasons we conclude that even if Crosby's 2009 conduct with the two females does not by itself constitute "harmful sexual conduct," the district court properly relied on it to support its finding of a course of harmful sexual conduct and a habitual course of sexual misconduct.

## III

Crosby finally argues that sufficient evidence does not support the district court's finding that he meets the other criteria for civil commitment as a sexual psychopathic personality and sexually dangerous person. A sexual psychopathic personality is

the existence in any person of such conditions of emotional instability, or impulsiveness of behavior, or lack of customary standards of good judgment, or failure to appreciate the consequences of personal acts, or a combination of any of these conditions, which render the person irresponsible for personal conduct with respect to sexual matters, if the person has evidenced, by a habitual course of misconduct in sexual matters, an utter lack of power to control the person's sexual impulses and, as a result, is dangerous to other persons.

Minn.Stat. § 253B.02, subd. 18b; *see also Linehan I*, 518 N.W.2d at 613. Crosby contends that he does not meet the "utter lack of power to control sexual impulses" element. A sexually dangerous person is a person who has engaged in a course of harmful sexual conduct, has manifested a sexual, personality, or other mental disorder or dysfunction, and, as a result, is likely to engage in acts of harmful sexual

conduct. Minn.Stat. § 253B.02, subd. 18c. Crosby disputes only the district court's finding that he is likely to engage in acts of harmful sexual conduct. He highlights the two offense-free decades between his 1987 and his 2009 criminal sexual offenses, his maintaining a family, house, and employment, and the dissimilarity between his former violent rapes and his recent sexual conduct with the two young females. He offers that "the best evidence that he has of his ability to control his sexual urges" is "the lack of an incident or allegation of wrongdoing" in the interim period between his abduction rapes and his soliciting the minor to perform sexually.

Two substantial weaknesses defeat Crosby's argument. The first is that although it may be true that Crosby took years before he reoffended, the fact is, he *did* reoffend. Despite the apparently long period without reoffense, that period ended before the state petitioned for commitment. The question before the district court was whether Crosby's psychosexual condition and his course of behavior reveals a *current* trajectory toward reoffense and renewed danger to others. The district court answered affirmatively. The only question before us on appeal is not whether we agree with the district court as a matter of fact; it is whether the evidence supports the district court's factual findings as a matter of law. *In re Thulin,* 660 N.W.2d at 144.

This leads us to the second weakness in Crosby's argument, which is that we are in an especially poor position to reverse the district court's weighing of evidence or to question its credibility determinations. *Dittrich v. Brown Cnty.,* 215 Minn. 234, 237, 9 N.W.2d 510, 512 (1943). The district court made its findings mindful that it should consider several factors when determining whether Crosby lacks the power to control his sexual impulses. *See In re*

*Blodgett,* 510 N.W.2d 910, 915 (Minn.1994). These include the nature and frequency of sexual offenses, the degree of violence used, the relationship between the offender and the victims, the offender's attitude and mood, the offender's medical and family history, the results of psychological and psychiatric testing and evaluation, and other factors that bear on the predatory sex impulse and lack of power to control it. *Id.* The district court considered these factors here, and it found that clear and convincing evidence proved that Crosby could not control his sexual impulses.

While reasonable minds might come to different findings, it is clear to us that the district court had abundant evidence supporting its finding that Crosby lacked control over his sexual impulses. Both Dr. Hoberman and Dr. Meyers opined that Crosby utterly lacks power to control his sexual impulses. Dr. Hoberman offered his assessment of Crosby's condition in light of the *Blodgett* factors. Dr. Meyers observed that picking up strangers to engage in sex crimes constitutes impulsive behavior, and he was concerned that Crosby appeared "clearly undeterred by the potential consequences of his deviant behaviors" and that he has consistently failed to remove himself from situations providing the opportunity for similar offenses. Dr. Meyers testified that he was particularly alarmed by Crosby's belief that he actually was "*helping* young women as he paid for them to perform sexual acts in his presence."

The district court also considered the requisite factors when it weighed the likelihood that Crosby would reoffend. *See In re Stone,* 711 N.W.2d 831, 840 (Minn.App.2006), *review denied* (Minn. June 20, 2006) (*citing Linehan I,* 518 N.W.2d at 614). These include the offender's demographic characteristics, the offender's history of violent behavior, the

base-rate statistics for violent behavior among individuals with similar backgrounds, the sources of stress in the offender's environment, the similarity between the present context to those when the offender previously used violence, and the offender's record of participation in sex-therapy programs. *Id.*

It is clear to us that the district court had sufficient evidence to find that Crosby is likely to reoffend. Dr. Meyers and Dr. Hoberman predicted reoffense and their opinion rested on their own observations. Dr. Meyers testified that Crosby was in an escalating phase of his offense cycle. He also believed that Crosby tended to cope with stress by sexually harming others. Dr. Hoberman testified that Crosby had almost all of the risk factors associated with recidivism. He explained that although the reoffense risk in some offenders declines with age, this was not so in Crosby's case. Dr. Hoberman warned that Crosby's treatment experience taught him merely to "speak the language" of treatment, raising doubts that prior treatment actually reduced Crosby's risk to offend. Drs. Hoberman and Meyers relied on an array of psychological tests informing their opinion that Crosby poses a very high risk to reoffend.

Crosby highlights Dr. Alberg's contrary opinions that the span between offenses shows that Crosby can control himself and that he showed control even in the 2009 sex offense because he did not physically injure the girl or the young woman. But the competing experts cannot all be right here. The district court was more persuaded by the testimony of Dr. Meyers and Dr. Hoberman than Dr. Alberg, and we will defer to the district court's resolution of conflicting expert testimony. *See In re Martenies*, 350 N.W.2d 470, 472 (Minn.App.1984), *review denied* (Minn. Sep. 12, 1984). We add that Crosby's insistence that he could control his urges is belied by the fact that he continued to fantasize about violent sexual scenarios even while leading the girl to perform sexually in front of him. The question is not whether Crosby restrained himself from acting on his violent impulses at various moments, but whether the evidence supports the finding that he could not perpetually control them and avoid reoffending.

We hold that clear and convincing evidence supports the district court's finding that Crosby has "an utter lack of power to control his sexual impulses" and is "likely to engage in acts of harmful sexual conduct" as required for civil commitment.

## DECISION

Because the 1987 plea agreement does not prohibit future commitment triggered by new misconduct, it does not prevent the state's petition or Crosby's current commitment. And because the district court had a sufficient factual basis to find that Crosby has returned to his violent offense cycle and clear and convincing evidence supports his commitment, we affirm.

**Affirmed.**