**Gordon B. CALL, Respondent,**

v.

**Maria GOMEZ, Commissioner of Human Services, et al., Appellants.**

**Nos. C6–95–444, C0–95–486.**

Supreme Court of Minnesota.

Aug. 4, 1995.

Hubert H. Humphrey, III, Atty. Gen., John L. Kirwin, William H. Mondale, Asst. Attys. Gen., St. Paul, and Michael O. Free-

man, Hennepin County Atty., Gayle C. Hendley, Carolyn A. Peterson, Asst. Hennepin County Attys., Minneapolis, for appellant.

Allan R. Poncin, Minneapolis, for respondent.

## OPINION

KEITH, Chief Justice.

Appellants, Minnesota Commissioner of Human Services and Hennepin County, appeal from an order of a special three-judge Supreme Court Appeal Panel discharging respondent, Gordon Call, from his indeterminate psychopathic personality commitment. Appellants contend that the appeal panel erred by failing to apply the statutory discharge criteria for persons committed as mentally ill and dangerous to the public and by concluding that respondent had to be discharged because appellants failed to prove that respondent continued to evince "an utter lack of control" over his sexual impulses. We reverse and remand.

In February 1993, respondent, Gordon Call, was initially committed as a psychopathic personality to the Minnesota Security Hospital. At that time, Call was serving two concurrent sentences in Minnesota for three separate sexual assaults. In its commitment order, the trial court made the following findings of fact.

Call, now age 48, has a long history of sexually assaultive and predatory behavior. He has admitted to committing at least 36 sexual assaults and other crimes involving boys, girls and adult women. His youngest victim was 6 or 7 years old and his oldest victim was in her mid-twenties. Call admitted to at least 30 rapes between 1978 and 1980.

At age 14, Call was committed to a state school because he had molested a young girl. In 1976 or 1977, on four separate occasions, Call sexually assaulted T.N., an 18-year-old developmentally disabled woman. T.N. was then a live-in baby sitter for Call's girlfriend. Call raped T.N. orally and anally, and on several occasions he threatened to kill her if she reported him to police. After the last assault, T.N. required medical treatment for damage to her rectum and suffered severe emotional distress. T.N. did not report the first three assaults because she feared that Call would follow through on his threat to kill her.

On February 21, 1980, Call offered a ride in his van to D.A., a 16-year-old female. Call eventually tied up D.A.'s hands and legs and took her to a motel, where, for an 11-hour period, he repeatedly raped her, orally, vaginally and anally. During the assault, Call threatened to kill D.A. if she did not cooperate. D.A. eventually escaped and contacted police. On May 28, 1980, Call pleaded guilty to first-degree criminal sexual conduct in Hennepin County District Court for the sexual assault of D.A. He was sentenced to serve an indeterminate sentence not to exceed 20 years.

As a part of his plea bargain for the sexual assault of D.A., another charge of first-degree criminal sexual conduct in Hennepin County was dismissed. That charge involved an assault that occurred on the evening of February 7, 1980, two weeks before the assault of D.A. That evening, Call offered a ride to M.W., a 23-year-old woman who was waiting at a bus stop. During the next 3 to 4 hours, Call assaulted and raped M.W. in his van, at times holding a knife to her throat and threatening to kill her on at least ten separate occasions. He became more sexually aroused as he threatened to kill her. M.W. was able to talk Call out of killing her, and he let her go, threatening to kill her if she reported him. As a result of the assault, M.W. had scratches on her throat from the knife, contracted a sexually transmitted disease, required dental work and was in therapy for several years.

After Call pleaded guilty in Hennepin County to the first-degree sexual assault of D.A., South Dakota filed a detainer on Call on charges of first-degree rape. On September 15, 1979, K.P., a 16-year-old female, was hitchhiking when Call and his half-brother offered her a ride. Call and his half-brother raped K.P. for several hours before leaving her at 2:00 a.m. on an isolated gravel road in

the country. On January 26, 1981, Call was convicted in South Dakota for the rape of K.P., and received a sentence of 15 years, to be served concurrently with his Minnesota sentence.

While he was serving his sentence in Minnesota, Call participated in a number of treatment programs, including chemical dependency treatment and sex offender treatment. In April 1985, Call was transferred to the Lino Lakes Correctional Facility to participate in the Transitional Sex Offender Program. He consistently received positive remarks for his participation. In February 1986, Call was granted a parole on his Minnesota sentence. South Dakota, however, denied Call's parole request, and he was permitted to serve the remainder of his South Dakota sentence in Minnesota. In March 1987, Call was transferred to a minimum security cottage at Lino Lakes. Call was allowed to participate in off-grounds duties with a special escort and was allowed to have a full-time off-grounds job under the supervision of civilian employees. He received above-average work evaluations and prison authorities considered his special duties participation to be successful.

Prison officials later discovered, however, that Call had committed several sexual assaults during the time that he was becoming less supervised. In 1984 or 1985, while Call was incarcerated at Lino Lakes, he contacted an adult woman, D.B., through a dating service. Their relationship progressed to what D.B. described as "phone sex." Call eventually told D.B. that he was in prison for statutory rape. At one point, he told D.B. that "[p]retty soon [your daughter] will be about 10 or 11 and she'll be nice and ripe for me because I'll be out of prison by then." On one occasion, D.B. visited Call at Lino Lakes, and he inserted his finger into her vagina, telling her to be quiet or she would get hurt. D.B. later agreed to meet Call to have sex during a supervised leave from Lino Lakes. The encounter, although initially consensual, turned violent when Call forced D.B. to have anal intercourse with him, despite her requests for him to stop.

In 1986, Call started a relationship with D.S., who would bring her 9–year–old daughter, C.S., to Lino Lakes for prison visits. In April 1986, in the visiting room at Lino Lakes, Call reached inside C.S.'s pants and touched her buttocks. On several occasions, Call phoned C.S. and made sexually explicit comments to her. During one escorted visit to the home of D.S., Call made C.S. rub his exposed penis. In August 1988, D.S. picked up Call from his civilian job site and brought him to her home where he sexually assaulted C.S.

In 1988, while on special duties off of the prison grounds, Call developed a relationship with R.B., a 16–year–old female. Call and R.B. continued to correspond after Call's special duty privileges were revoked in August 1988. Call wrote letters to R.B. in which he detailed explicit sexual fantasies involving R.B. Once the relationship was discovered, prison staff ordered Call to cease communication with R.B.

In August 1988, after his sexual misconduct was discovered, Call was transferred to the Minnesota Correctional facility at Stillwater. His Minnesota parole was revoked and he was assigned to serve his sentence until June 23, 1993, the expiration date of his Minnesota sentence. On December 20, 1988, Call pleaded guilty in Hennepin County District Court to second-degree criminal sexual conduct for the assault of C.S. He was sentenced to serve 36 months to run concurrently with his previous Minnesota and South Dakota sentences.

On May 23, 1989, Call was transferred to the Complex One Treatment Unit at the Minnesota Correctional Facility at Oak Parks Heights. Call reportedly made progress in the Complex One treatment program, although staff felt that Call did not internalize treatment concepts. Call also participated in chemical dependency treatment and he acknowledged a long history of substance abuse.

In June 1990, Call entered the sex offender treatment group at Complex One. At one point, he had a conflict with his female case manager. Call told her that if he were in the community, she was the kind of woman that he would choose to rape. Call had other difficulties with the success of his treatment

and he was eventually terminated from the Complex One program in July 1991, after he arranged to meet another inmate in the bathroom for a kiss.

In February 1992, Call was transferred to the Transitional Sex Offender program at Lino Lakes. When Call first entered the program, he was still angry with his case manager. Call admitted to staff that he fantasized about anally raping his case manager, holding her head and slapping her.

Eventually, the Director of Mental Health Services at the Minnesota Correctional Facility at Oak Park Heights filed a petition for commitment. After a four-day hearing in August and October 1992, Call was committed as a psychopathic personality on February 3, 1993. On June 15, 1993, the Minnesota Court of Appeals affirmed the commitment in an unpublished opinion. C9–93–501, 1993 WL 207824 (Minn.App. June 15, 1993). While appeal of the initial commitment was pending in this court, the district court held the statutorily required 60–day review hearing and concluded in a November 29, 1993 order that Call was in need of further treatment and that he should be committed as a psychopathic personality for an indeterminate period to the Minnesota Security Hospital. On February 4, 1994, this court, by order, summarily affirmed the initial commitment. C9–93–501, 1994 WL 772648 (Minn. Feb. 4, 1994). Call again appealed to the court of appeals, challenging the sufficiency of the evidence with respect to his indeterminate commitment. The court of appeals affirmed in an unpublished opinion filed May 3, 1994. CX–93–2600, 1994 WL 164229 (Minn. App. May 3, 1994). On June 29, 1994, this court denied review of Call's indeterminate commitment. The U.S. Supreme Court denied certiorari. —— U.S. ——, 115 S.Ct. 519, 130 L.Ed.2d 425 (1994).

In May 1994, Call petitioned the Minnesota Commissioner of Human Services for a special review board hearing. He requested full discharge and a transfer to Anoka Metro Regional Treatment Center. On August 19, 1994, the special review board recommended that the Commissioner deny Call's petition, which the Commissioner did on August 29, 1994. On September 12, 1994, Call petitioned for a review of his request for discharge before the Supreme Court Appeal Panel (hereinafter "appeal panel").[1] A hearing was held before a three-judge appeal panel.

On February 17, 1995, the appeal panel, with one judge dissenting, ordered that Call be fully discharged. On that same day, the Chief Judge of the appeal panel filed a request for answers to two certified questions, seeking guidance on the standard to be applied in psychopathic personality discharge hearings. Appellant Commissioner and appellant Hennepin County both appealed to the court of appeals, as did respondent. The court of appeals dismissed the certified questions. We granted accelerated review of the consolidated appeals of both appellants.

### I.

The central issue in this appeal is whether the appeal panel applied the correct standard in determining that Call should be fully discharged from his commitment as a psychopathic personality. The appeal panel held that to continue Call's psychopathic personality commitment, appellants had to prove that Call continued to evince an utter lack of power to control his sexual impulses, which is one of the three criteria that must be met in order to justify initial commitment as a psychopathic personality. *See State ex rel. Pearson v. Probate Court of Ramsey County*, 205 Minn. 545, 287 N.W. 297 (1939), *aff'd*, 309 U.S. 270, 60 S.Ct. 523, 84 L.Ed. 744 (1940). Appellants argue, however, that to continue Call's commitment as a psychopathic personality, they had to prove that Call did not meet the statutory discharge criteria for persons committed as mentally ill and dangerous

---

1. At the time of Call's commitment, section 526.10, subdivision 1 of the psychopathic personality statute provided, pursuant to Minn.Stat. § 253B.19 (1992) (recodified with respect to review of psychopathic personality commitments at § 253B.185 (1994)), that a person committed as a psychopathic personality could petition a special three-judge review panel, established by the supreme court pursuant to statute, for a rehearing and reconsideration of a decision of the Commissioner with respect to a request for transfer or discharge.

to the public set forth in Minn.Stat. § 253B.18, subd. 15 (1992).

At the time Call was committed, the psychopathic personality statute, Minn.Stat. § 526.09.115 (1992) (repealed, ch. 1, art. 1, § 6, 1st spec. sess. 1994), provided for the commitment of any person determined to be a "psychopathic personality." The term "psychopathic personality" referred to:

> [T]he existence in any person of such conditions of emotional instability, or impulsiveness of behavior, or lack of customary standards of good judgment, or failure to appreciate the consequences of personal acts, or a combination of any such conditions, as to render such person irresponsible for personal conduct with respect to sexual matters and thereby dangerous to other persons.

Minn.Stat. § 526.09 (1992). In 1939, this court upheld the constitutionality of the psychopathic personality statute, narrowing its construction to include only those individuals:

> [W]ho by a habitual course of misconduct in sexual matters have evidenced an utter lack of power to control their sexual impulses and who as a result are likely to attack or otherwise inflict injury, loss, pain, or other evil on the objects of their uncontrolled and uncontrollable desire.

*State ex rel. Pearson v. Probate Court of Ramsey County*, 205 Minn. 545, 555, 287 N.W. 297, 302 (1939), *aff'd*, 309 U.S. 270, 60 S.Ct. 523, 84 L.Ed. 744 (1940); *see also In re Linehan*, 518 N.W.2d 609 (Minn.1994) (applying *Pearson* construction of statute), *reh'g denied* (Minn., Aug. 15, 1994); *In re Blodgett*, 510 N.W.2d 910 (Minn.) (holding that

psychopathic personality statute is constitutional and reaffirming *Pearson* construction of statute), *cert. denied*, —— U.S. ——, 115 S.Ct. 146, 130 L.Ed.2d 86 (1994).[2]

At the time Call was committed, the psychopathic personality statute did not set forth discharge procedures. Instead, the statute provided that "[e]xcept as otherwise provided in this section or in chapter 253B, the provisions of chapter 253B, pertaining to persons mentally ill and dangerous to the public shall apply with like force and effect to persons having a psychopathic personality * * *." Minn.Stat. § 526.10 (1992).[3] The discharge procedures pertaining to a person committed as mentally ill and dangerous to the public provide that such a person shall not be discharged unless he or she: (1) is capable of making an acceptable adjustment to open society, (2) is no longer dangerous to the public, and (3) is no longer in need of inpatient treatment and supervision. Minn. Stat. § 253B.18, subd. 15 (1994).

In the present case, the appeal panel explicitly refused to apply the statutory discharge criteria for a person committed as mentally ill and dangerous to the public. In its order discharging Call from his commitment, the appeal panel held that our decision in *In re Linehan*, 518 N.W.2d 609 (1994), mandated Call's discharge because, as in *Linehan*, "the county did not prove the utter lack of control/uncontrollable element of the *Pearson* test."

In *Linehan*, this court held that the record before it failed to support by clear and convincing evidence the trial court's conclusion that appellant met the second and third ele-

---

**2.** In 1994, during a special session, the Minnesota legislature repealed Minn.Stat. §§ 526.09–.115, amending and recodifying section 526.09 in the Civil Commitment Act, at Minn.Stat. § 253B.02, subd. 18a (1994). The definition of "Sexual psychopathic personality" now reads, with the new language emphasized:

> "Sexual psychopathic personality" means the existence in any person of such conditions of emotional instability, or impulsiveness of behavior, or lack of customary standards of good judgment, or failure to appreciate the consequences of personal acts, or a combination of any of these conditions, which render the person irresponsible for personal conduct with respect to sexual matters, *if the person has*

> *evidenced, by a habitual course of misconduct in sexual matters, an utter lack of power to control the person's sexual impulses and, as a result, is* dangerous to other persons.

Minn.Stat. § 253B.02, subd. 18a (1994) (emphasis added).

**3.** The newly recodified psychopathic personality statute also states that "[e]xcept as otherwise provided in this section, the provisions of this chapter pertaining to persons mentally ill and dangerous to the public apply with like force and effect to persons who are alleged or found to be sexually dangerous persons or persons with a sexual psychopathic personality." Minn.Stat. § 253B.185 (1994).

ments of *Pearson:* (a) that appellant had "'an utter lack of power to control * * * sexual impulses'" so that (b) it is likely appellant would "'attack or otherwise inflict injury, loss, pain or other evil on the objects of [his] uncontrolled and uncontrollable desire.'" 518 N.W.2d at 613 (quoting *Minnesota ex rel. Pearson v. Probate Court of Ramsey County*, 309 U.S. 270, 274, 60 S.Ct. 523, 526, 84 L.Ed. 744 (1940), *aff'g*, 205 Minn. 545, 287 N.W. 297 (1939)). Our holding was based on the facts of that case and nothing in our decision purported in any way to change the standard for commitment as a psychopathic personality. *See also In re Rickmyer*, 519 N.W.2d 188 (Minn.1994) (applying *Pearson* test and holding that evidence was insufficient to commit appellant as psychopathic personality). The *Pearson* standard, which this court applied in *Linehan*, is the standard for determining whether an individual should be *committed* as a psychopathic personality.

It is clear that the legislature has determined that the statutory discharge criteria set forth in section 253B.18, subdivision 15, applicable to the discharge of persons committed as mentally ill and dangerous to the public, shall also be applied to persons who have been committed as psychopathic personalities. *See* Minn.Stat. § 526.10 (1992).

 We believe that so long as application of the statutory criteria comports with the basic constitutional requirement that "the nature of commitment bear some reasonable relation to the purpose for which the individual [was originally] committed," the statutory discharge criteria set forth in section 253B.18, subdivision 15, should apply to per-

sons committed as psychopathic personalities. *Foucha v. Louisiana*, 504 U.S. 71, 79, 112 S.Ct. 1780, 1785, 118 L.Ed.2d 437 (1992);[4] *see also Jackson v. Indiana*, 406 U.S. 715, 738, 92 S.Ct. 1845, 1858, 32 L.Ed.2d 435 (1972); *Lidberg v. Steffen*, 514 N.W.2d 779, 783 (Minn.1994).

We held in *In re Blodgett* that a person is committed as a psychopathic personality when he or she both needs treatment for an identifiable sexual disorder, as defined by the statute and by this court's decision in *Pearson*, and poses a danger to the public. 510 N.W.2d 910, 914–15 (Minn.), *cert. denied*, —— U.S. ——, 115 S.Ct. 146, 130 L.Ed.2d 86 (1994). In *Blodgett*, we noted that although the term "psychopathic personality" is antiquated and does not refer to a currently classified mental illness, the term refers to more than "a mere social maladjustment." *Id.* at 914. We stated that "[t]he psychopathic personality statute identifies a volitional dysfunction which grossly impairs judgment and behavior with respect to the sex drive" and that "the 'psychopathic personality' is an identifiable and documentable violent sexually deviant condition or disorder." *Id.* at 915.

In *Blodgett*, we rejected the argument "that a psychopathic personality condition is untreatable, and, therefore, confinement is equivalent to life-long preventive detention." 510 N.W.2d at 916.[5] Even if treatment for a psychopathic personality disorder is "problematic, * * * [s]o long as civil commitment is programmed to provide treatment and periodic review, due process is provided." *Id.* We held that once a person is committed, his or her due process rights are protected

---

4. In *Foucha*, the Supreme Court held that Louisiana could not continue to confine petitioner, who was found not guilty of aggravated burglary by reason of insanity and was committed to a psychiatric hospital until such time as doctors recommended that he be released, because although petitioner continued to be dangerous, he was no longer mentally ill. The Court held that a committed acquittee may be held only so long as he or she is *both* mentally ill and dangerous. 504 U.S. at 77–78, 112 S.Ct. at 1784.

5. In fact, Call and the other persons committed as psychopathic personalities to the Minnesota Security Hospital are receiving intensive treatment for their sexual disorder. Testimony at Call's discharge hearing indicated that Minneso-

ta has a well-planned and well-structured treatment program, which the hospital initiated in October 1993. The program is structured around the concept of "relapse prevention" and consists of four phases. It is an outcome-based program that requires participants to master the skills of each phase before moving on to the next phase. Each phase creates a decrease in the amount of external security required for the patient. The fourth phase involves preparing for and obtaining discharge into the community. During phase four, county representatives take a more active role in the treatment and pending discharge process. An average patient is expected to complete the program in a minimum of 24 months.

through procedural safeguards that include periodic review and re-evaluation, the opportunity to petition for transfer to an open hospital, the opportunity to petition for full discharge, and the right to competent medical care and treatment. *Id.* With respect to discharge we stated:

> In *Foucha* the confinement was for insanity and, when the insanity was shown to be in remission, the United States Supreme Court said Foucha had to be released. Here, if there is a remission of Blodgett's sexual disorder, if his deviant sexual assaultive conduct is brought under control, he, too, is entitled to be released.

*Id.* at 918 (footnotes omitted).

■■■ A person committed as a psychopathic personality must be discharged if no reasonable relation exists between the original reason for commitment and the continued confinement. As noted above, a person is committed as a psychopathic personality because he or she both requires treatment for an identifiable sexual disorder, as defined by the statute and by this court's decision in *Pearson,* and poses a danger to the public. To justify discharge, the statutory discharge criteria for persons committed as mentally ill and dangerous to the public require a showing that the person is capable of making an acceptable adjustment to open society, is no longer dangerous to the public, and is no longer in need of inpatient treatment and supervision. Minn.Stat. § 253B.18, subd. 15.

■■■ So long as the statutory discharge criteria are applied in such a way that the person subject to commitment as a psychopathic personality is confined for only so long as he or she continues both to need further inpatient treatment and supervision for his sexual disorder and to pose a danger to the public, continued commitment is justified because the confinement bears a reasonable relation to the original reason for commitment. We believe that the statutory discharge criteria set forth in section 253B.18, subd. 15, can be applied to meet these requirements.

■■■ In applying the discharge criteria, we note that a slight change or improvement in the person's condition is not sufficient to justify discharge. Moreover, contrary to what the appeal panel held in the present case, it is also not sufficient that the person no longer evinces the utter lack of control over his sexual impulses. The utter lack of control over one's sexual impulses is part of the threshold showing that must be met to justify commitment. Confinement may continue without meeting this threshold if the confinement still bears the reasonable relation to the original reason for commitment; that is, the person continues to need treatment for his sexual disorder and continues to pose a danger to the public, which are the reasons for which the person was originally committed as a psychopathic personality. We do not believe that a person who is one step below an utter lack of control over his sexual impulses is necessarily in "remission" of his or her sexual disorder, such that his or her "deviant sexual assaultive conduct is brought under control." *Blodgett,* 510 N.W.2d at 916.

Because the appeal panel did not apply the statutory discharge criteria set forth in section 253B.18, subdivision 15, applicable to persons committed as mentally ill and dangerous to the public, we reverse and remand. In considering whether Call should be discharged from his psychopathic personality commitment, we direct the appeal panel to apply the discharge criteria set forth in section 253B.18, subdivision 15, in a manner consistent with this opinion. That is, Call's commitment and treatment should continue if the state proves by clear and convincing evidence that he does not meet the statutory discharge criteria because he continues to need inpatient treatment and supervision for his sexual disorder and continues to be a danger to the public.

## II.

Call also argued before the appeal panel that his continued commitment violates double jeopardy. We reject Call's argument for two reasons. First, Call asserted this claim and had it decided against him on direct appeal from his original commitment. He cannot now seek to reassert this claim.

■■■ Moreover, even if Call could assert a double jeopardy claim, our decision in *Blod-*

*gett* clearly establishes that commitment under the psychopathic personality statute is remedial and does not constitute double jeopardy because it is for treatment purposes and is not for purposes of preventive detention. 510 N.W.2d at 916; *see also Pearson,* 205 Minn. at 550, 287 N.W. at 300 (holding that a psychopathic personality commitment is not for punitive or punishment purposes, but rather is remedial because a person committed as such is entitled to receive treatment).

Reversed and remanded.