*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A23-1852**

In the Matter of the Civil Commitment of: Kenneth Steven Daywitt.

**Filed April 29, 2024**
**Affirmed**
**Worke, Judge**

Commitment Appeal Panel
File No. A21-9095

Gerald S. Weinrich, Rochester, Minnesota (for appellant)

Keith Ellison, Attorney General, Leaf McGregor, Assistant Attorney General, St. Paul, Minnesota (for respondent Commissioner of Human Services)

Mark A. Ostrem, Olmsted County Attorney, Michael E. Davis, Assistant County Attorney, Rochester, Minnesota (for respondent Olmsted County)

Considered and decided by Gaïtas, Presiding Judge; Worke, Judge; and Connolly, Judge.

**NONPRECEDENTIAL OPINION**

**WORKE**, Judge

Appellant challenges the dismissal of his petition seeking discharge or provisional discharge from his civil commitment as a sexually dangerous person (SDP), or transfer to community preparation services (CPS). We affirm.

FACTS

In 2009, appellant Kenneth Steven Daywitt was civilly committed as an SDP to the Minnesota Sex Offender Program (MSOP) for an indeterminate period of time. Daywitt's civil commitment was based on a history of both charged and uncharged sexual misconduct.

In 1996, when Daywitt was approximately 13 years old, he sexually assaulted five children. Three of the victims were boys between the ages of seven and nine; Daywitt touched the genitals of all three and engaged in oral penetration with one of the boys. The boys did not report Daywitt's assaults, and Daywitt was not charged with any crimes stemming from his conduct. The other two victims were a five-year-old girl and a five-year-old boy. Daywitt engaged in sexual contact with the children and attempted to have sexual intercourse with the girl, which caused physical injuries. The children reported the assaults, and Daywitt was adjudicated delinquent of two counts of first-degree criminal sexual conduct. Daywitt entered a sex-offender treatment program for juveniles and remained there until he was 17 years old, when he was discharged and ordered to participate in outpatient sex-offender treatment. He was unsuccessfully discharged from that treatment program based on his poor attitude and lack of participation.

In 2001, when Daywitt was 18 years old, he sexually assaulted a 15-year-old boy. At the time, Daywitt was on supervised release and awaiting sentencing for two counts of false imprisonment.[1] Daywitt was convicted of fourth-degree criminal sexual conduct for

_____

[1] The false-imprisonment convictions arose from an incident in which Daywitt confronted four males, including three juveniles, claimed to be an officer with the Minnesota

2

the offense against the 15-year-old boy.  The district court stayed execution of sentence and placed Daywitt on probation.  Following multiple probation violations, including failure to complete sex-offender treatment, the district court revoked the stay and executed Daywitt's prison sentence.

Between 2002 and 2009, Daywitt spent the majority of time incarcerated or in various sex-offender treatment programs.  He was unsuccessfully discharged or terminated from at least four treatment programs, all for his sexualized behavior or lack of progress. In June 2009, as Daywitt's release date from prison approached, the department of corrections assessed his risk of reoffending and assigned him a risk level of three—the highest risk rating.  Following civil-commitment proceedings, Daywitt was indeterminably committed to MSOP as an SDP in September 2009.  At the time, Daywitt's diagnoses included paraphilia-not otherwise specified, pedophilia, antisocial personality disorder, and narcissistic personality disorder.

In June 2020, Daywitt petitioned the special review board (SRB) for a reduction in custody.  Daywitt sought discharge, provisional discharge, or transfer to CPS.  The SRB recommended that the petition be denied.  Daywitt then petitioned for rehearing and reconsideration by a commitment appeal panel (CAP), and the CAP appointed Dr. Tyler Dority as examiner.

---

Department of Natural Resources, displayed a weapon, and ordered the four males into a fenced enclosure.  The males ultimately left the area after determining that Daywitt was not a law-enforcement officer and that his weapon was an air pistol.

In September 2023, the CAP held a hearing on Daywitt's petition. In support of his petition, Daywitt submitted an MSOP Quarterly Treatment Report from March 2021 and a release plan that he created. Daywitt also testified and called Dr. Dority to testify. After Daywitt presented his evidence, respondents Commissioner of Human Services and Olmsted County (collectively, the commissioner) moved to dismiss the petition pursuant to Minn. R. Civ. P. 41.02(b). The CAP granted the motion. The CAP determined that Daywitt failed to assert a prima facie case that he was entitled to either discharge or provisional discharge, and failed to demonstrate by a preponderance of the evidence that transfer to CPS was appropriate. This appeal followed.

**DECISION**

Daywitt challenges the CAP's dismissal of his petition for a reduction in custody. As the commissioner notes, the determinations as to whether an individual is entitled to a discharge or transfer to CPS involve different procedures and burdens. Accordingly, we address each in turn.

### *Discharge*

A person who is committed as an SDP may petition for discharge or provisional discharge from commitment. Minn. Stat. §§ 253D.30-.31 (2022). A person may be fully discharged if a CAP determines that they are (1) "capable of making an acceptable adjustment to open society," (2) "no longer dangerous to the public," and (3) "no longer in need of treatment and supervision." Minn. Stat. § 253D.31. A provisional discharge similarly requires that the committed person be "capable of making an acceptable

4

adjustment to open society." Minn. Stat. § 253D.30, subd. 1(a). Additionally, the following factors must be considered when evaluating a petition for provisional discharge:

> (1) whether the committed person's course of treatment and present mental status indicate there is no longer a need for treatment and supervision in the committed person's current treatment setting; and

> (2) whether the conditions of the provisional discharge plan will provide a reasonable degree of protection to the public and will enable the committed person to adjust successfully to the community.

*Id.*, subd. 1(b).

When petitioning for discharge or provisional discharge, the committed person "bears the burden of going forward with the evidence, which means presenting a prima facie case with competent evidence to show that the person is entitled to the requested relief." Minn. Stat. § 253D.28, subd. 2(d) (2022). To satisfy this burden, the person must produce "competent evidence that, if proven," would satisfy the criteria for discharge or provisional discharge. *Larson v. Jesson*, 847 N.W.2d 531, 535 (Minn. App. 2014) (quoting *Coker v. Jesson*, 831 N.W.2d 483, 486 (Minn. 2013)); *see Woolsey v. Woolsey*, 975 N.W.2d 502, 507 (Minn. 2022) (noting that a party "ma[kes] a prima facie case by alleging facts that, if true, would provide sufficient grounds for [the relief sought]"). During this phase, the CAP must view the evidence in the light most favorable to the committed person. *Coker*, 831 N.W.2d at 491. And the CAP may consider only the evidence produced by the committed person. *In re Civ. Commitment of Poole*, 921 N.W.2d 62, 66 (Minn. App. 2018), *rev. denied* (Minn. Jan. 15, 2019). Failure to assert a prima facie case may warrant

5

dismissal of the petition under Minn. R. Civ. P. 41.02(b). *Coker*, 831 N.W.2d at 489. We review the dismissal of a petition under rule 41.02 de novo. *Larson*, 847 N.W.2d at 534.

At the outset, we note that Daywitt does not identify the statutory criteria for discharge or provisional discharge, and as such it is somewhat unclear if he is challenging the denial of his request for discharge, provisional discharge, or both. "Because the criteria for a provisional discharge are more lenient than the criteria for a discharge," we start with a review of the CAP's determination that Daywitt failed to assert a prima facie case for provisional discharge. *See id.* at 535.

Daywitt argues that the CAP erred in determining that he failed to assert a prima facie case supporting provisional discharge because he expressed remorse for his past conduct and prepared a detailed plan to assist with his return to the community and prevent recidivism. But these arguments do not squarely address the statutory criteria for provisional discharge. As noted above, when considering if a committed person is entitled to provisional discharge, the CAP must consider the committed person's treatment needs and whether a provisional discharge plan will adequately protect the public and allow the person to adjust to the community. Minn. Stat. § 253D.30, subd. 1(b). The CAP determined that Daywitt failed to offer competent evidence that he no longer required inpatient treatment and supervision. The record supports these determinations.

At the hearing, Daywitt testified about his course of treatment. Following his civil commitment in 2009, Daywitt participated in treatment for several years but then withdrew his consent and stopped participating. He began participating again in 2016 and progressed to phase two of MSOP's three-phase treatment program. At the time of the hearing,

6

Daywitt remained in phase two of the program. He explained that to advance to phase three, he would first have to complete a full disclosure polygraph, sexual-offender assessment, and masturbation polygraph. Daywitt had recently attempted to complete the full-disclosure polygraph but was unable to because the circumstances surrounding the polygraph examination triggered his post-traumatic stress disorder (PTSD). He would also have to go before a panel and speak about his offending history and relapse-prevention plan before advancing to phase three.

In addition to his treatment progress, Daywitt acknowledged his history of rule-breaking behavior. Daywitt was transferred to the secured facility in St. Peter in January 2022 and received five Behavioral Expectation Reports (BER)[2] following his transfer. This included a BER for an incident in May 2022 in which Daywitt exposed his penis to another committed individual and that individual touched Daywitt's penis. Daywitt testified that he and the individual "had engaged in sexual behavior in a prior instance," and "had been in a relationship." He testified that he did not consider the incident for which he received a BER to be behavior that constituted "sexually acting out." Daywitt also received a BER for being in a room with another individual with the lights off and a BER for having medication in his room that he did not have authorization to self-administer.

Daywitt also called Dr. Dority to testify at the hearing. Dr. Dority commended Daywitt's progress and release plan but ultimately opined that Daywitt "would not be

_____

[2] A committed person receives a BER for violating the program's established behavioral expectations. A BER may result in loss of privileges or other restrictions depending on the severity of the violation or number of BERs received.

appropriate for a provisional or full discharge" due to Daywitt's "remaining treatment needs" and the "need for involvement in reintegration treatment programming." Dr. Dority explained that Daywitt needed to continue engaging in treatment and expressed concern over the fact "that there's only a relatively short period of time that [Daywitt] has been engaging with treatment while not violating . . . very significant expectations, such as sexual relationships with other clients, etc." Additionally, Dr. Dority testified that various risk-assessment tools "indicate a fairly high remaining risk."

On this record, the CAP did not err in determining that Daywitt failed to assert a prima facie case for provisional discharge. To assert a prima facie case for discharge, a committed person must offer more evidence than their own self-serving and conclusory statements that they meet the criteria. *Poole*, 921 N.W.2d at 68-69. As the CAP noted, Daywitt failed to produce any competent evidence that he met the statutory criteria for provisional discharge. Daywitt's general assertions that he demonstrates remorse and has developed a relapse-prevention plan, even if proven, would not satisfy the statutory criteria for provisional discharge. And, apart from his own testimony and the quarterly report, Daywitt presented only the testimony of Dr. Dority, who did not support Daywitt's petition. Daywitt therefore failed to assert a prima facie case that he was entitled to provisional discharge. Finally, because the criteria for provisional discharge are more lenient than the criteria for discharge, the CAP similarly did not err in dismissing Daywitt's petition for discharge.

*Transfer to CPS*

We review the CAP's transfer decision for clear error. *In re Civ. Commitment of Edwards*, 933 N.W.2d 796, 803 (Minn. App. 2019), *rev. denied* (Minn. Oct. 15, 2019); *see Foster v. Jesson*, 857 N.W.2d 545, 548-49 (Minn. App. 2014) (explaining the different applications of rule 41.02 in the contexts of a petition for a full or provisional discharge, and a petition for transfer). Under the clear-error standard of review, it is not proper for this court to reweigh the evidence; rather, the court's role is to review "the record to confirm that evidence exists to support the decision." *In re Civ. Commitment of Kenney*, 963 N.W.2d 214, 222 (Minn. 2021). In doing so, this court defers to the CAP's evaluation of expert testimony. *See In re Civ. Commitment of Fugelseth*, 907 N.W.2d 248, 256 (Minn. App. 2018), *rev. denied* (Minn. Apr. 17, 2018).

"A party seeking transfer under section 253D.29 must establish by a preponderance of the evidence that the transfer is appropriate." Minn. Stat. § 253D.28, subd. 2(e) (2022). The CAP must evaluate whether transfer to CPS is appropriate in light of five factors: (1) the committed person's clinical progress and treatment needs; (2) the need for security to complete the person's continuing treatment; (3) the need for institutionalization; (4) the best facility for the person's needs; and (5) whether a reasonable degree of public safety can be maintained. Minn. Stat. § 253D.29, subd. 1(b)(2022).

Here, the CAP determined that Daywitt failed to establish by a preponderance of the evidence that transfer was appropriate. Because of the different burden and procedure that apply when evaluating a transfer request, rather than a petition for discharge, the CAP properly considered both Daywitt's and the commissioner's evidence and determined that

transfer was not appropriate. Specifically, the CAP noted that Dr. Dority, a risk assessor, and Daywitt's treatment team "all opine that a transfer is premature." The CAP also determined that Daywitt's progress was "relatively recent and [was] combined with significant rule-breaking behaviors." This determination is consistent with Dr. Dority's testimony that Daywitt was "nearing" the point at which transfer to CPS would be appropriate but needed to first "continue engaging" in the program without committing significant rule violations. Dr. Dority indicated that rule-breaking behavior presented a concern for a person seeking transfer to CPS but clarified that he would not oppose a transfer based on a person's technical violations if those violations did not bear on the ability to function at CPS.

The CAP determined that transfer was inappropriate based on Daywitt's significant rule-breaking behavior, which included engaging in a sexual relationship with another individual at MSOP, his attempts to minimize or "explain away" his behavior, and his high risk of re-offense as indicated by the risk-assessment tools and examiners. The CAP explained that these considerations related directly to Daywitt's treatment and institutionalization needs, which facility would best serve those needs, and public-safety concerns. On this record, we discern no clear error in the CAP's transfer decision. The CAP appropriately evaluated the evidence relevant to transfer and analyzed the statutory factors listed in section 253D.29, subdivision 1(b), in light of that evidence. Because there is evidence in the record that supports the CAP's transfer decision, Daywitt has not demonstrated clear error. *See Kenney*, 963 N.W.2d at 222.

10

***Continued confinement***

Finally, Daywitt generally alleges that "he does not meet the criteria for continued commitment because he does not suffer from a sexual mental disorder." According to the quarterly report submitted by Daywitt, Daywitt's diagnoses at the time of the hearing included other specified paraphilic disorder, in a controlled environment; unspecified personality disorder with narcissistic features; and PTSD. At the hearing, Dr. Dority similarly testified that Daywitt's diagnoses included "other specified paraphilic disorder, non-consent in a controlled environment." Daywitt argues that the diagnosis of other specified paraphilic disorder is insufficient "to justify continued confinement in an institutional setting."

The supreme court has explained that to satisfy due-process protections, a committed person "must be discharged if no reasonable relation exists between the original reason for commitment and the continued confinement." *Call v. Gomez*, 535 N.W.2d 312, 319 (Minn. 1995). A committed person may therefore be "confined for only so long as he or she continues both to need further inpatient treatment and supervision for his [or her] sexual disorder and to pose a danger to the public." *Id.* But due process does "not require[] any particular mental condition as a prerequisite for a person's ongoing civil commitment." *In re Civ. Commitment of Opiacha*, 943 N.W.2d 220, 228 (Minn. App. 2020).

Because due process does not require a specific mental condition as a prerequisite for ongoing civil commitment, Daywitt's general assertion that the diagnosis of other specified paraphilic disorder cannot justify continued commitment is without merit. And

11

the record demonstrates that a reasonable relation exists between Daywitt's original commitment and his continued need for confinement.

Daywitt was indeterminately civilly committed based on his history of sexual misconduct. At the time of his original commitment, Daywitt's diagnoses included, as relevant here, a paraphilia disorder. Dr. Dority testified that Daywitt remains in need of additional sex-offender treatment for his paraphilia disorder and explained that the disorder causes Daywitt to have urges that need to be "tested in the real-world environment." Dr. Dority acknowledged that it can be difficult to remove that diagnosis when a committed person is confined to the secure setting of MSOP but indicated that opportunities available to those at CPS would present the ability "to engage with" those sorts of "high risk scenario[s]." And as noted above, Dr. Dority believed that Daywitt was "nearing" the point at which transfer to CPS was appropriate but had not yet reached that point. Thus, the record establishes that Daywitt is in need of additional treatment and supervision for a sexual disorder, and that he specifically needs to demonstrate that he is not a danger to the public by exhibiting the ability to control his urges in "high-risk scenario[s]." Daywitt has therefore failed to demonstrate that he is no longer in need of treatment in a confined setting.

**Affirmed.**