*This opinion is nonprecedential except as provided by
Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A24-1017**

In the Matter of the Civil Commitment of: Rodger Dean Robb II.

**Filed November 18, 2024
Affirmed
Connolly, Judge**

Commitment Appeal Panel
File No. AP20-9168

Rodger Dean Robb II, Moose Lake, Minnesota (pro se, appellant)

Keith Ellison, Attorney General, Benjamin Johnson, Assistant Attorney General, St. Paul, Minnesota (for respondent Commissioner of Human Services)

Mary F. Moriarty, Hennepin County Attorney, Jennifer Inz, Brittany D. Lawonn, Assistant County Attorneys, Minneapolis, Minnesota (for respondent Hennepin County)

Considered and decided by Connolly, Presiding Judge; Larkin, Judge; and Ede, Judge.

**NONPRECEDENTIAL OPINION**

**CONNOLLY**, Judge

Pro se appellant Rodger Dean Robb II (appellant) challenges the denial of his petition for full discharge from his indeterminate civil commitment to the Minnesota Sex Offender Program (MSOP) as a sexually dangerous person (SDP). He argues that: (1) the record does not support the commitment appeal panel's (CAP's) finding that he has a mental illness to support continued commitment; (2) the statutory discharge criteria do not comply with due process; and (3) the CAP made several evidentiary and procedural errors.

Because the record sustains the CAP's findings and appellant has not adequately briefed his remaining arguments, we affirm.

**FACTS**

Appellant is 74 years old and is currently civilly committed as a sexually dangerous person (SDP) to the Minnesota Sex Offender Program (MSOP). In February 2001, this court affirmed the indeterminate commitment of appellant as SDP. *In re Robb II*, 622 N.W.2d 564, 566 (Minn. App. 2001), *rev denied* (Minn. Apr. 17, 2001). The bases for commitment included multiple convictions for criminal sex offenses and a history of uncharged criminal sexual behavior.

In 1976, when appellant was 26 years old, he committed sexual offenses against four minor boys. Some of the victims' ages are unknown, but the victims' ages generally ranged from 10 to 13 years old. While appellant was employed at a school as the band director, he attempted to unzip the pants of the first victim during a band lesson. After that incident, appellant molested two male students. Appellant was not charged for his conduct. Appellant then molested a 10-year-old boy by touching the boy's genitals. For this, appellant was charged with disorderly conduct, and he received a stayed sentence on the condition that he complete counseling.

Three years later, appellant was charged with three counts of criminal sexual conduct for molesting three more boys aged 12 years old. He plead guilty to one count of second-degree criminal sexual conduct and received a stayed sentence on the condition that he complete Intensive Treatment Program for Sexual Aggressives (ITPSA). While appellant was in treatment at ITPSA, he molested a 15-year-old boy while the boy was

2

sleeping. He was not charged for the incident. A year later, he was caught molesting another minor male at ITPSA. He was then terminated from ITPSA, his probation was revoked, and he served 21 months in prison.

From 1992 to 1993, when appellant was 42 and 43 years old, he sexually assaulted three minor boys. In one of the incidents, appellant forced a 12-year-old boy onto a bed, held him down, and masturbated him. Appellant continued to abuse this boy ten more times. Appellant abused two 14-year-old boys at his apartment in a similar manner on multiple occasions. For these incidents, he was charged with one count of first-degree criminal sexual conduct and two counts of third-degree criminal sexual conduct. He pleaded guilty to all three counts and was sentenced to 98 months in prison.

Following civil commitment proceedings, appellant was indeterminately committed as a sexually dangerous person in February 2001. At the time of the indeterminate commitment proceedings, appellant's diagnoses included "paraphilia-not otherwise specified," and "personality disorder-not otherwise specified, with narcissistic and antisocial traits."

In 2005, appellant and another MSOP resident escaped from the St. Peter facility. He was apprehended 12 hours later in Omaha, Nebraska. Appellant claimed that one of his victims helped him escape and stated the victim, "volunteered to help because he believed I got the shaft, so he felt bad." After he was extradited to Minnesota he was convicted of escaping from a "mental hospital."

In October 2019, appellant petitioned for a reduction in custody.[1]  A year later, the Special Review Board (SRB) recommended denial of appellant's petition for a transfer to community preparation services (CPS),[2] provisional discharge, or full discharge. Appellant then petitioned to the CAP for rehearing and reconsideration of the SRB's recommendations.[3]

### First-phase hearing

On July 19, 2022, the CAP held a first-phase hearing on appellant's petition. Appellant proceeded only on his petition for full discharge and withdrew his petition for transfer or provisional discharge.

The CAP received testimony from Dr. Jessica Mugge, Ph.D. (Dr. Mugge), a clinical psychologist retained by appellant.  Dr. Mugge was the only witness appellant called.  Dr. Mugge completed a psychological evaluation of appellant.  She testified to her diagnosis of appellant's sexual and personality disorder.  She concluded that she "did not find sufficient evidence to diagnose a paraphilic disorder."  She explained that the DSM-5 criteria of a paraphilic disorder include that the victims are under the age of 13.  And because appellant's "offense history were ages 12 to 14 or older," she did not diagnose him with a paraphilic disorder.  She also testified that appellant could fit the criteria for

---

[1] Appellant also petitioned for full discharge in 2017.  *In re Civ. Commitment of Robb II*, No. A18-1521, 2019 WL 1007796, at *1 (Minn. App. Mar. 4, 2019).  This court affirmed the CAP's dismissal of his petition at the first-phase hearing.  *Id.*
[2] CPS is a "non-secure facility" at MSOP-St. Peter.  *In re Civ. Commitment of Fugelseth*, 907 N.W.2d 248, 251 (Minn. App. 2018), *rev. denied* (Minn. April 17, 2018).
[3] We refer to the judicial appeal panel as the commitment appeal panel or CAP.  *See* Minn. Stat. § 253D.28, subd. 1(a) (2022).

"hebephilia" based on his offense history, which is attraction to "post-pubescent males." Dr. Mugge explained that hebephilia is not within the DSM-5, "simply because the research suggests that men who are attracted to pubescence" are normal, but "acting on that [attraction] is deviant and illegal and that's a problem." She also testified that appellant has some "narcissistic personality traits," which could support a "specified or unspecified personality disorder" diagnosis, but his traits are "not enough to meet full criteria for narcissistic personality disorder." Dr. Mugge ultimately concluded that "because of [appellant's] treatment needs" he is not safe to release to society and is dangerous to the public.

The CAP held that appellant did not produce a prima facie case with competent evidence to meet the statutory criteria for discharge. The CAP cited to Dr. Mugge's evaluation, noting that she opined that appellant did not meet the statutory criteria for discharge from civil commitment, because appellant lacked progress in sex-offender treatment, and she could not determine if existing protective factors effectively reduced his risk for reoffending. But the CAP concluded that appellant "presented the bare minimum evidence to proceed to a Phase II hearing on the issue of mental illness" under a due-process analysis. The CAP found that appellant did not present competent evidence to support a finding that he no longer poses a danger to the community, but the CAP was "left with questions regarding [appellant's] continued mental illness." The CAP noted that at least six other experts diagnosed appellant with various mental illnesses throughout the duration of his civil commitment, and it required further information on the issue of how appellant's mental illness relates to the issue of dangerousness to support continued civil commitment.

*Second-phase hearings*

The CAP held three second-phase hearings that concluded on September 12, 2023. The CAP received 31 exhibits into evidence and testimony from three witnesses: (1) Christopher Schiffer (Schiffer), (2) Dr. Mallory Jorgenson (Dr. Jorgenson), and (3) Dr. Tyler Dority (Dr. Dority).

Schiffer is the clinical services director at MSOP. The parties stipulated that Schiffer testified as an expert witness. Schiffer opined that the petition for discharge "was premature." He testified that appellant is "consistent" in not engaging in treatment, is "essentially untreated," and "hasn't engaged in therapy to address any of the affects of his offense dynamics that could be addressed through treatment." He acknowledged that appellant does occasionally speak with his primary therapist, but this is not adequate treatment. He explained that appellant is in a "precontemplative" phase of treatment, where he "does not recognize his behaviors as harmful or problematic" nor recognize "treatment as potentially helpful."

Dr. Jorgenson is a forensic evaluator with the Department of Human Services. The parties stipulated that Dr. Jorgenson testified as an expert witness. Dr. Jorgenson prepared two sexual violence risk assessments of appellant. In preparing her assessments, she used risk-assessment tools that indicated appellant poses average risk of sexual recidivism.

She opined that appellant does not meet the statutory criteria for discharge, that he has a mental disorder, that he continues to pose a danger to the public due to his mental disorders, and that he continues to require treatment. She testified that in assessing appellant, it was notable that he offended against "a number of minor males over an

6

approximate 17-year period" and "that he continued to offend despite multiple criminal interventions." Dr. Jorgenson diagnosed appellant with "other specified paraphilic disorder pubescent males in a controlled environment." She opined appellant is diagnosed with this disorder because he has a "number of victims" in the age range of "11 to 14." She further explained that although she did not diagnose appellant with hebephilia, that "hebephilia and pubescent is often viewed . . . as kind of interchangeable language."

Dr. Jorgenson also diagnosed appellant with "provisional narcissistic personality disorder." She testified appellant "demonstrated a real pervasive lack of empathy," a "willingness to manipulate others," and "made statements viewing himself as superior." She testified that she qualified the personality disorder as "provisional," according to the DSM-5, to indicate there is a strong presumption that the disorder is present. But she did not have enough information to remove the "provisional" identifier from her diagnosis, in part because appellant has not participated in treatment.

Dr. Dority is the court-appointed examiner. He also prepared a sexual violence risk assessment. He used risk assessment tools that also indicated appellant is at average risk for sexual recidivism. Dr. Dority testified that appellant does not meet the statutory criteria for discharge and continues to pose an unreasonable risk to the public.

Dr. Dority diagnosed appellant with "other specified paraphilic disorder pubescent males in a controlled environment" and "unspecified personality disorder with narcissistic and other cluster B features." He testified these disorders are recognized by the DSM-5. Dr. Dority testified that although "hebephilia" is not in the DSM-5, "just because every

single possible type of paraphilia . . . [is] not expressly specified in the [DSM-5] . . . does not mean they don't exist."

The CAP found that appellant is diagnosed with a paraphilic and personality disorder, remains a danger to the community, and that "continued commitment is appropriate according to both the statutory discharge criteria and the due process considerations." The CAP then denied appellant's petition for full discharge from civil commitment.

## DECISION

### I. The CAP did not clearly err by determining appellant has a mental illness.

A committed person who petitions for discharge must first file the petition with the SRB. Minn. Stat. § 253D.27, subd. 2 (2022). If the SRB recommends the CAP deny the petition, then the committed person may petition for "rehearing and reconsideration" by the CAP of the SRB recommendation. Minn. Stat. §§ 253D.27, subd. 4; 253D.28, subd. 1 (2022). The CAP conducts phased hearings on the petition. At the first-phase hearing, the committed person bears the burden to present a "prima facie case with competent evidence" that the committed person should be discharged. Minn. Stat. § 253D.28, subd. 2(d) (2022). If the committed person meets that burden, then the party opposing discharge "bears the burden of proof by clear and convincing evidence" that the discharge should be denied at the second-phase hearing. *Id.*

A person committed as SDP can be fully discharged if the CAP determines that he is (1) "capable of making an acceptable adjustment to open society," (2) "no longer dangerous to the public," and (3) "no longer in need of treatment and supervision." Minn.

8

Stat. § 253D.31 (2022). In determining whether the CAP will grant the person's requested discharge, the CAP considers "whether specific conditions exist to provide a reasonable degree of protection to the public and to assist the committed person in adjusting to the community." *Id.* If these specific conditions do not exist, then the "discharge shall not be granted." *Id.*

The CAP must apply the statutory criteria in a manner that comports with due process protections. *Call v. Gomez*, 535 N.W.2d 312, 318 (Minn. 1995). Due process protections are satisfied when the "nature of commitment bear[s] some reasonable relation to the purpose for which the individual was originally committed." *Id.* (quotations omitted). This reasonable relation exists if a committed person continues to both (1) "need further inpatient treatment and supervision for his sexual disorder" and (2) poses a danger to the public. *Id.* at 319.

We review the CAP's decision on the merits of a petition for clear error. *In re Civ. Commitment of Edwards*, 933 N.W.2d 796, 803 (Minn. App. 2019), *rev. denied* (Minn. Oct. 15, 2019). When reviewing factual findings for clear error, "we view the evidence in a light favorable to the findings," and we do not reweigh the evidence or reconcile conflicting evidence. *In re Civ. Commitment of Kenney*, 963 N.W.2d 214, 221-22 (Minn. 2021). Thus, we "need not go into an extended discussion of the evidence to prove or demonstrate the correctness of the [CAP's] findings," because it is the CAP's "primary responsibility" to determine fact issues. *Id.* at 222. Under a clear error review, "an appellate court's duty is fully performed after it has fairly considered all the evidence and has determined that the evidence reasonably supports the decision." *Id.*

9

Appellant argues that he "lacks a sexual, personality, or mental disorder or dysfunction that requires ongoing treatment." To support his contention, appellant states that the CAP "erred by accepting fictitious diagnoses from Drs. Jorgenson and Dority either rejected by the medical community or not complying with the requirements of DSM-5." The diagnosis appellant claims is fictitious is hebephilia. We construe his argument to be a challenge to the CAP's findings.

As noted above, the CAP considered whether appellant has a mental illness to support continued commitment under a due-process analysis. It found that appellant is diagnosed with a paraphilic and personality disorder, appellant continues to pose a danger to the community, and "continued commitment is appropriate according to both the statutory discharge criteria and the due process considerations." The record supports the CAP's findings for two reasons.

First, as noted above, each expert testified in regard to appellant's paraphilic diagnosis. Dr. Jorgenson and Dr. Dority each testified that they diagnosed appellant with "other specified paraphilic disorder pubescent males in a controlled environment." Dr. Mugge was the only expert who testified that she did not have enough information to diagnose him with a paraphilic disorder, but that he may fit the criteria for "hebephilia," even though hebephilia is not presently an independent diagnosis in the DSM-5. Dr. Jorgenson and Dr. Dority agreed that appellant could be diagnosed with hebephilia, but opined hebephilia could be included under the "other specified paraphilic disorder" category in the DSM-5. The CAP ultimately found Dr. Jorgenson and Dr. Dority credible and found Dr. Mugge's testimony that she did not have enough evidence to diagnose

appellant with a paraphilic disorder to be "less persuasive." Expert testimony in civil commitment cases is important to determine a person's mental state, *Kenney*, 963 N.W.2d at 224, and we generally defer to the CAP's evaluation of expert testimony so long as the record as a whole supports the CAP's evaluation. *Edwards*, 933 N.W.2d at 805. And due process does "not require[] any particular mental condition as a prerequisite for a person's ongoing civil commitment." *In re Civ. Commitment of Opiacha*, 943 N.W.2d 220, 228 (Minn. App. 2020). Upon review of the record, we conclude that the record sustains the CAP's findings. *See In re Civ. Commitment of Navratil*, 799 N.W.2d 643, 648 (Minn. App. 2011) (concluding the district court did not clearly err by finding patient was diagnosed with sexual disorder after patient was diagnosed with paraphilia and expert witnesses testified he would meet criteria for hebephilia).

Second, each expert also testified in regard to appellant's personality disorder. Dr. Jorgenson testified she diagnosed him with "provisional narcissistic personality disorder." Dr. Dority diagnosed appellant with "unspecified personality disorder with narcissistic and other cluster B features." And Dr. Mugge testified that he has some "narcissistic personality traits," but his traits are "not enough to meet full criteria for narcissistic personality disorder." Again, the CAP found Dr. Jorgenson and Dr. Dority credible, but found "Dr. Mugge's testimony contradictory, as she testified that there was not evidence of a personality disorder, yet admitted that these 'narcissistic traits' could be included under a valid diagnosis listed in the DSM-5." There is ample evidence in the record to support the CAP's finding that appellant has a personality disorder and requires further treatment to support continued commitment.

11

To the extent that the CAP considered whether appellant required further inpatient treatment, it found that "continued commitment is appropriate" and the "record is devoid of evidence that [appellant] no longer requires treatment."[4] This finding is supported by the record, because Schiffer testified that appellant refuses to participate in treatment and the CAP received MSOP's treatment reports of appellant into evidence. And refusing to engage in treatment does not establish that appellant no longer needs treatment. *See In re Blodgett*, 510 N.W.2d 910, 916 (Minn. 1994) (stating that: "[i]t also seems somewhat incongruous that a sexual offender should be able to prove he is untreatable by refusing treatment"). On the issue of dangerousness, the CAP found "[n]o evidence was presented showing that [appellant] no longer presents a danger to the community." This finding is also supported by the record, because every expert agreed that appellant remains a danger to the public. And Dr. Jorgenson and Dr. Dority determined that appellant poses an "average risk" for re-offending.

Because the CAP did not clearly err by finding that appellant does not meet the statutory discharge criteria or due process discharge criteria, his argument that "holding [him] without a valid diagnosis and/or for dangerousness alone violates 14th Amendment due process protections" fails.[5]

---

[4] At the first-phase hearing, the CAP also concluded appellant did not produce a prima facie case on the issue of statutory discharge. In other words, appellant did not provide evidence suggesting that he was no longer in need of treatment.

[5] Because we conclude that the CAP's findings are both sufficient for review and supported by the record, appellant's arguments that the CAP made insufficient findings fails.

**II.** **Appellant's argument that the statutory discharge criteria cannot be reconciled with the constitutional standard is not adequately briefed.**

Appellant also contends that "the relevant discharge standard must include the need for further inpatient treatment" and the "new, more stringent discharge standard cannot be reconciled with the constitutional standard set forth in Minnesota case law." We construe his argument to be a challenge to the discharge statute. We review issues of statutory interpretation de novo. *Fugelseth*, 907 N.W.2d. at 253.

In 2018, the legislature removed the word "inpatient" from the statutory criteria that a committed person shall not be discharged if the person "is no longer in need of inpatient treatment and supervision." 2018 Minn. Laws ch. 194, § 2, at 423-24. Appellate courts have repeatedly stated that the relevant discharge standard must include the need for further inpatient treatment to comply with constitutional law. *See Call*, 535 N.W.2d at 319; *Fugelseth*, 907 N.W.2d at 255; *In re Civ. Commitment of Poole*, 921 N.W.2d 62, 66 (Minn. App. 2018), *rev. denied* (Minn. Jan. 15, 2019). Appellant supports his contention by quoting from an unpublished decision, *In re Civ. Commitment of Hogy*, A19-1181, 2019 WL 6286408, at *4-6 (Minn. App. Nov. 25, 2019), *rev. denied* (Minn. Jan. 21, 2020). But this court's decision in *Hogy* did not reach the issue of whether the 2018 change to the discharge statute can be reconciled with the constitutional standard; instead, it applied the constitutional standard for discharge set forth in case law by considering whether the appellant in that case was (1) in need of inpatient treatment and supervision and (2) a danger to the public. *Id.* Appellant offers no further argument to support his contention. We

13

decline to reach an issue in the absence of adequate briefing. *In re Civ. Commitment of Kropp*, 895 N.W.2d 647, 653 (Minn. App. 2017), *rev. denied* (Minn. June 20, 2017).

**III.   Appellant's arguments that the CAP erred in its evidentiary rulings or procedural decisions fail.**

Appellant argues the CAP erred in four evidentiary rulings or procedural decisions because the CAP (1) "ignored their own [o]rder and allowed other testimony which was prejudicial to [a]pellant," (2) denied excerpts of testimony from another case that appellant sought to introduce into evidence, (3)  denied "appellant the opportunity to cross-examine the court's examiner," and (4) accepted statutory analysis from the expert witnesses.[6] Appellant did not raise these arguments with the CAP, so we do not consider them. *See Kropp*, 895 N.W.2d at 653.  To the extent that appellant did raise the issue of the CAP allowing prejudicial testimony below, on appeal he has not identified testimony that the CAP erroneously admitted.  We decline to reach issues that are inadequately briefed. *See Kropp*, 895 N.W.2d at 653.

**Affirmed.**

---

[6]  We are aware of the Minnesota Supreme Court's recent opinion, *In re Civ. Commitment of Benson*, where the court determined that "Minn. Stat. § 253D.20 establishes a waivable right to counsel" and that to proceed pro se, a committed person must be deemed competent to enter a knowing and intelligent waiver. __ N.W.3d __, 2024 WL 4551311, at *8 (Minn. Oct. 23, 2024).  Although the facts presented here and in *Benson* are similar, we conclude *Benson* does not apply in this case.  The committed person in *Benson* requested that he be allowed to personally examine witnesses and stated that "prefers to proceed pro se." *Id.* at *2.  Here, appellant also requested that he be allowed to personally cross-examine witnesses, and the record shows he requested new counsel to be appointed during the second-phase hearings.  But appellant unambiguously stated that he was not requesting to proceed pro se; rather he said, "I'm just asking for different representation."  Therefore, *Benson* does not apply to appellant's request to personally cross-examine witnesses because he did not also request to proceed pro se.